# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

***

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | 2:11-cr-00189-RLH-VCF-1 |
| vs. | REPORT AND RECOMMENDATION ON |
| JOSEPH POBLETE, | MOTION TO SUPPRESS (#20) |
| Defendant. | |

## REPORT & RECOMMENDATION

Before the court is defendant Joseph Poblete's Motion to Suppress (#20). The government filed an Opposition (#23), and the defendant filed a Reply (#24). Officer Basner, Officer Johnson, Detective Thai and Ms. Julie Alvarez testified at an evidentiary hearing held on August 16, 2012. (#45). The court ordered the government and the defendant to file supplemental briefs. The government filed its supplement on August 30, 2012 (#49), and the defendant filed his response to the government's supplement on September 20, 2012 (#53).

Defendant Poblete is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (#1). Defendant seeks an order suppressing all tangible and testimonial evidence seized during an inventory search conducted on or about January 11, 2011. (#20). Poblete asserts that the officers who conducted search of the vehicle violated his Fourth Amendment rights because (1) the inventory search was improper and had no legal basis, and (2) the officers did not follow the Las Vegas Metropolitan Police Department's (hereinafter "LVMPD") guidelines for conducting an inventory search. *Id.* The government argues that Poblete has no standing to assert a

Fourth Amendment violation, as he had no privacy interest in the vehicle he was driving.  (#23).  If the court finds that Poblete had a privacy interest and therefor standing, the government asserts that the inventory search was lawful and that the officers followed the LVMPD guidelines.  *Id.*

## SUMMARY OF DECISION

Defendant Poblete sustained his burden of demonstrating a legitimate expectation of privacy in the vehicle he was driving.

The government proved by a preponderance of the evidence that the decision to impound the car and the inventory search of the car were lawful and did not violate the LVMPD's guidelines.

Accordingly, the Motion to Suppress should be DENIED.

## FACTS

On January 11, 2011, LVMPD Officers Basner and Johnson were patrolling the area of Lindell and Rochelle in Las Vegas, NV.  (#20, #23 and #50 Hearing Transcript).  At around 10:20 p.m., the officers were at a stoplight, and observed a car approaching the intersection with high beams on.  *Id.* The car turned on Lindell, and the officers noticed that the car was unregistered and did not have a license plate.  *Id.*  The car was not being driven erratically, and the officers did not cite the driver for any traffic violations.  (#50).   The officers initiated a stop of the car, a 2010 Chrysler four-door Sedan (hereinafter "the car" or "the car Poblete was driving"), by activating their red lights.  (#20, #23 and #50).  Officer Basner testified that the reason for the stop was the car's high beams and fact that the car did not have license plates and/or registration.  (#50).  The car pulled into the parking lot of Jack Potter's Bar, a 24-hour bar located on the northwest corner of Jones and Harmon (Defendant's Exhibits A and B), and legally parked in a designated parking spot.  (#20, #23 and #50).  The patrol vehicle parked behind the car blocking the car from exiting.  (#50).

The officers approached the car, and Officer Basner noticed that the car was occupied by a male driver and two female passengers.  *Id.*  Officer Basner, who had approached on the driver's side, asked

the driver for his driver's license.  *Id.*  The driver identified himself as "Lawrence Poblete," but told the officers that he did not have his driver's license with him because he left it at home.  *Id.*  Officer Basner asked the driver the spelling of his name and his birth date.  *Id.*  Officer Basner testified that the driver paused when spelling his first name, but that he was able to spell his last name easily.  (#50).

Officer Basner testified that he questioned whether the driver "was being completely honest about who he was" because of the pausing.  *Id.*  Officer Basner asked the driver to step out of the car. (#20, #23, and #50).  The two female  passengers remained in the car, while Officer Johnson stood near the passenger side door.  (#50).   Officer Basner received verbal consent to search the driver's person, and found a wallet in the left rear pocket of the driver's pants which contained a Corrections Inmate card. (#20, #23, and #50).  The driver's picture was on the card, and the card indicated that the driver was defendant "Joseph Poblete" (hereinafter "defendant" or "Poblete").  *Id.*  Officer Basner also located a baggy containing a white crystal-like substance in defendant Poblete's pocket, that Officer Basner thought to be methamphetamine based on his experience.  *Id.*  Officer Basner handcuffed defendant Poblete.  *Id.*  Officer Basner testified that once he detained Poblete, he was "under arrest."  *Id.* Defendant Poblete was not charged with possession of methamphetamine or with driving without a license.  (#50).  Officer Basner testified that he verified the information on the Corrections Inmate card, and discovered that defendant Poblete was a convicted felon.[1]  *Id.*

Officer Basner asked the two female occupants, identified as Julie Alvarez and Beverly Pacheco, to exit the car after defendant Poblete was handcuffed.  *Id.*  Julie Alvarez testified that she and the other passenger were handcuffed.  *Id.*  Officer Basner testified that the officers tried to "verify who the vehicle belonged to," as there was no license plate, by running the VIN# and reviewing the documents provided to the officers.  *Id.*  A run of the VIN# revealed that the car was registered to Cesar Alvarez and that the

[1] The government stated in its opposition that defendant has numerous felony convictions which were indicated on the card, including: (1) a 2008 conviction, in the State of Nevada, for Attempted Theft, (2) two 2003 convictions, in the State of California, for Possession of a Controlled Substance for Sale with Priors and Transporting a Controlled Substance in California, and (3) a 2001 conviction, in the State of California, for Transporting a Controlled Substance.  (#23).

car was not reported stolen. *Id.* Officer Basner also asked the women questions regarding the ownership of the car, and Julie Alvarez, defendant Poblete's girlfriend, informed the officers that the car belonged to her father[2], Cesar Alvarez, who lives in California. *Id.* Julie Alvarez gave the officers her driver's license (Defendant's Exhibit M, Copy of DMV Driver Record Information), which indicated that her address was 39396 Vanderbuilt Ct. Marietta, CA. (#50). Officer Basner testified that he ran Julie Alvarez' license to verify her information, and that he doesn't remember what came up, but that if she had any warrants or if her information was faulty in any way, he would have arrested her, but didn't. *Id.*

Alvarez testified that she provided the officers with documentation, including the sale contract (Defendant's Exhibit L) and the car registration (Defendant's Exhibits J and K and Government's 2(b)). *Id.* The address on her license and the documents relating to the car matched. *Id.* Officer Basner testified that he remembers being given the Bill of Sale, but not what it contained. *Id.* Pictures of the interior of the car indicated that documents were laying on the front seat (Government's Exhibit 2(a)), but during the hearing Officer Basner was unable to identify what specific documents they were. *Id.* Officer Basner testified that he asked for a contact number for the owner of the car, and that Julie Alvarez provided the officers with contact numbers for both her father and mother. *Id.* Officer Basner testified that the person who gave him the number said that the father worked late and would not be able to be reached. *Id.* Julie Alvarez testified that neither of the two LVMPD officers asked for her parents' telephone numbers at this time[3]. *Id.* Officer Basner testified that he personally called the number provided by Julie Alvarez, but that he was unable to reach anyone. *Id.* Officer Basner could not recall, however, which cell phone he used to call the father or if he dialed from a blocked number. *Id.*

---

[2]During direct examination, Officer Basner testified that Julie Alvarez' uncle owned the car. (#50). On cross-examination, however, Officer Basner stated that after reviewing the report, the owner of the car was Julie Alvarez' father. *Id.*
[3]Julie Alvarez testified that she gave Detective Thai her mother's number later, as he was the only one to ask for the number, and that he called *after* the search, sometime after midnight. (#50).

Officer Basner testified that after the attempt to contact the owner of the car and verify information was unsuccessful, he decided to impound the car for safekeeping and call for a tow-truck. *Id.*  He also testified that the decision to call the tow was because he was not "sure if [the defendant and the passengers] were supposed to be in possession of the vehicle." *Id.*   Officer Basner stated that the decision to call the tow truck was made pursuant to LVMPD's policy. *Id.*

Officer Basner could not recall during cross-examination how he called the tow-truck, either by cell phone or through radio dispatch, and the CAD Report (Defendant's Exhibit D) did not indicate that a tow truck was called. *Id.*  The tow truck did not arrive at the scene. *Id.*  After deciding to call the tow-truck, Officer Basner testified, the officers conducted an inventory of the car. *Id.*  The inventory search yielded a Bersa, Model Mini 9 FireStorm, 9mm handgun in the center console of the vehicle. (#20, #23, and #50).  Officer Basner testified that he did not recall filling out a tow sheet or an inventory sheet (LVMPD 503 form) during the search of the car. (#50).  After discovering the handgun, Officer Basner called Detective Thai to the scene. *Id.*

Detective Thai arrived at the scene sometime between 11:00 p.m./12:00 a.m. *Id.*  When Detective Thai arrived, defendant Poblete was in the patrol car and passengers Alvarez and Pacheco were outside of the car defendant was driving. *Id.*  Detective Thai could not recall if the passengers were handcuffed when he arrived. *Id.*  Detective Thai spoke with Officer Basner, who informed him of the circumstances surrounding the stop, the inventory search, and the discovery of the gun. *Id.*  Officer Basner also told Detective Thai that he tried to contact the owner of the car, who lives in California, but that the attempt was unsuccessful. *Id.*

Detective Thai testified that he made contact with Poblete and read him his *Miranda* warnings. (#50).  Poblete provided a recorded statement to Detective Thai, but the detective could not recall if he questioned Poblete regarding the owner of the car. *Id.*  The passengers were also interviewed by Detective Thai. *Id.*  At the beginning of the interview with Julie Alvarez, Detective asked her for her

identification and asked her to state her home address, which she stated as 39396 Vanderbuilt Avenue Marietta, CA.  (Defendant's Exhibit N, Audio Recording of Alvarez Interview).  Julie Alvarez also stated that she and Poblete had been dating, off and on, for about three years.  *Id* (Defendant's Exhibit N).  Detective Thai asked her about the circumstances surrounding the traffic stop.  *Id* (Defendant's Exhibit N).  Julie Alvarez stated that when the officers asked for Poblete's license and registration, and he didn't have it on him, the officers came to her side of the car and she told them it was her car and provided the officers with her driver's license (Defendant's Exhibit M), the insurance, the registration (Defendant's Exhibit E), and "proof that the car is...brand new."  *Id* (Defendant's Exhibit N).

Julie stated to the detective that after Poblete was in handcuffs, the officers took the passengers out of the car, handcuffed them, and put them in front of the car.  *Id* (Defendant's Exhibit N).  She stated that after asking "basic questions," the officers asked for permission to search the car, and she responded "for what reason do you need to?"  *Id* (Defendant's Exhibit N).  She told Detective Thai that she "never gave them a yes for it," but that one officer "searched [her] car a little bit."  *Id* (Defendant's Exhibit N).[4]  Detective Thai explained to Julie Alvarez that the decision to tow the car was based on the officers' inability to verify its owner.  (Defendant's Exhibit N).  Detective Thai confirmed during the interview that Julie Alvarez had informed him that the car was bought for her by her father and that since her father worked late hours it would be difficult to reach him, but that her mother could be reached.  *Id* (Defendant's Exhibit N).

Julie Alvarez provided Detective Thai with proof that the car was recently purchased in California and a temporary permit.  *Id* (Defendant's Exhibit N).  Julie Alvarez' name was not on the documents, but the address listed on her driver's license, which she had provided to Detective Thai, matched the address on the documents.  (#50).

---

[4]During the hearing, Officer Johnson testified that he did not ask for consent to search the car.  (#50).  Julie Alvarez testified (contrary to her statement in Defendant's Exhibit N) that the officers did <u>not</u> ask for her consent to search the car.  (#50).

Julie Alvarez provided Detective Thai with her parents' phone number, and Detective Thai was able to speak with Mr. Alvarez personally[5].   *Id.*   Detective Thai confirmed that the car was recently purchased by Mr. Alvarez, but the detective did not inquire as to whether Poblete was given permission to drive the car.   *Id.*   Detective Thai testified that the individual on the phone described the vehicle, but did not provide self identifying information.   *Id.*   Detective Thai testified that since he was satisfied that the true owner, Mr. Alvarez, was Julie Alvarez' father, he decided to call off the tow and release the car to her.   *Id.*   On cross-examination, Detective Thai testified that he didn't remember if in fact he physically called off the tow, and that it was possible that he did not make the call.   *Id.*   Detective Thai prepared a report of the incident, and included in the report that the car was going to be towed at some point during the night.   *Id.*   During the interview, Detective Thai also questioned Julie Alvarez about the gun found in the car, and she confirmed that the gun belonged to Poblete.   *Id* (Defendant's Exhibit N).

On May 17, 2011, a one count indictment was filed against defendant Joseph Poblete charging him with Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2).   (#1). Neither Ms. Alvarez nor Ms. Pacheco were charged with any crimes.   (#20, #23, and #50).

### DISCUSSION

In his motion to suppress, defendant Poblete asserts that the decision to impound and the subsequent search of the car he was driving violated the Fourth Amendment and the LVMPD's policies. (#20).   Defendant Poblete asks this court to suppress all statements and tangible evidence derived from the unlawful search of the car.   *Id.*

### I.   Fourth Amendment

The Fourth Amendment guarantees individuals the right "to be secure in their persons . . . against unreasonable searches and seizures."   U.S. Const. Amend. IV.   With respect to warrantless searches,

---

[5] During examination, Detective Thai said he spoke with Mr. Alvarez personally, but on the recorded interview, Detective Thai stated that since he was able to contact Julie Alvarez' mother, the car was going to be released to Julie.

"searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 F.2d 347, 357 (1967).  These exceptions include: (1) a search incident to a lawful arrest, *See Weeks v. United States*, 232 U.S. 383, 392 (1914), (2) a search "conducted pursuant to a valid consent of a person in control of the premises," *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990), and (3) when vehicles are impounded, an inventory search conducted pursuant to guidelines for securing and inventorying the automobile's contents, *See e.g. South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

### A.     Seizure

"[W]hen an officer, by means of physical force or some show of authority, has in some way restrained the liberty of a citizen," a seizure occurs within the meaning of the Fourth Amendment. *Terry*, 392 U.S. at 19.  Here, the court finds that defendant Poblete was seized when he complied with the officers' order to stop the car indicated by the patrol car's lights.  *Id; United States v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011)(holding that "[i]n the absence of physical force, in order to constitute a seizure, an officer's show of authority must be accompanied by "submission to the assertion of authority."").

### B.     Standing

The defendant has the burden of proving a legitimate expectation of privacy in the vehicle searched.  *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).  "[A]s a general proposition, the issue of standing involves two inquiries: first, whether the proponent of a particular legal right has alleged "injury in fact," and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978) (citing *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *140 Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d

343 (1975); *Data Processing Service v. Camp*, 397 U.S. 150, 152–153, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184 (1970)).  The inquiry "requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.*

The court in *Rakas* stated that "*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), provides guidance in defining the scope of the interest protected by the Fourth Amendment," as the court there held that "capacity to claim the protection of the Fourth Amendment depends not upon a *property right* in the invaded place but upon whether the person who claims the protection of the Amendment has a *legitimate expectation of privacy* in the invaded place." *Id* at 143 (emphasis added). The court held that the defendants in *Rakas*, who were mere passengers in a car, had not demonstrated that they had a legitimate expectation of privacy in the car, because: (1) they asserted neither a property nor a possessory interest in the car, nor an interest in the property seized, (2) even though they were "legitimately in the car," they had no expectation of privacy in the glove box or under the seat of the car where they were merely passengers (the court found the glove box and under the seat to be analogous to the trunk, where a passenger would not normally have an expectation of privacy), and (3) unlike in *Jones v. United States,* 362 U.S. 257 (1960)*,* the defendants, as mere passengers, did not have dominion and control over the car and could not exclude others.  *Id* at 148-149.

In *United States v. Portillo,* 633 F.2d 1313 (9th Cir. 1980), the Ninth Circuit drew a distinction between a passenger in a car and the driver.  The court stated that "[u]nder the facts of this case, Portillo (the passenger) is in the same position as were the petitioners in *Rakas.* He was merely a passenger in the Dodge.  He "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." *Rakas v. Illinois*, 439 U.S. at 148, 99 S.Ct. at 433. Therefore, he does not possess an expectation of privacy which the fourth amendment was designed to protect."  *Portillo,* 633 F.2d at 1317.  "On the other hand," the court stated, the driver Montellano "is very much in the same position as was the defendant in Jones..."  *Id.*  The court held that "Montellano had both permission to use his

friend's automobile and the keys to the ignition and the trunk, with which he could exclude all others, save his friend, the owner. Montellano, therefore, possesses the requisite legitimate expectation of privacy necessary to challenge the propriety of the search." *Id.*

In a more recent United States Supreme Court case, the court addressed the issue of whether a passenger had standing to assert a Fourth Amendment violation and whether a passenger is seized within the meaning of the Fourth Amendment when law enforcement stops the car. *Brendlin v. California,* 551 U.S. 249 (2007).  The court there made no distinction between a passenger and a driver. *Id.* The court held that the passenger of a car must have standing to allege such violations and that "evidence uncovered as a result of an arbitrary stop [can't] be admissible against any passengers," as to rule otherwise would "be a powerful incentive to run the kind of "roving patrols" that would still violate the driver's Fourth Amendment right." *Id* at 263.

In *United States v. Thomas,* 447 F.3d 1191 (9th Cir. 2006), the Ninth Circuit addressed the issue of whether a driver of a rental car had a legitimate expectation of privacy even though he was not formally listed as an authorized driver on the rental agreement.  The court held that "[a]n expectation of privacy is a legitimate one if it is one which society accepts as objectively reasonable." *Thomas,* 447 F.3d 1196 (citing *Minnesota v. Olson,* 495 U.S. 91, 95-96 (1990)).  "[A] defendant who lacks an ownership interest may still have standing to challenge a search, upon a showing of "joint control" or "common authority" over the property searched." *Id.*  Common authority, the court held, "rests on mutual use of the property by persons generally having joint access or control for most purposes." *Id* (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (quotation omitted)).

The court stated that "a defendant may have a legitimate expectation of privacy in another's car if the defendant is in possession of the car, has the permission of the owner, holds a key to the car, and has the right and ability to exclude others, except the owner, from the car." *Id.*  The Ninth Circuit held

that "an unauthorized driver who received permission to use a rental car and has joint authority over the car may challenge the search to the same extent as the authorized renter," and that "[t]his approach is in accord with precedent holding that indicia of ownership-including the right to exclude others-coupled with possession and the permission of the rightful owner, are sufficient grounds upon which to find standing." *Id* at 1199 (citing *Jones*, 362 U.S. at 266, 80 S.Ct. 725; *Portillo*, 633 F.2d at 1317)).

The court also held that "[a]n unauthorized driver may have standing to challenge a search if he or she has received permission to use the car." *Id.*  As the defendant in *Thomas* failed to demonstrate that he received permission to drive the car, the court held that he did not have standing to assert a Fourth Amendment violation. *Id.*

### C.    Exceptions To Warrantless Search Requirements

#### 1.    Valid Consent

A warrantless search is constitutional if conducted pursuant to the valid consent of a person in control of the premises. *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990)(*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).  "The government has the burden of demonstrating that consent to a warrantless search was voluntary," and "[v]oluntariness is a question of fact to be determined from all the surrounding circumstances." *Id.* When viewing the surrounding circumstances, "there is no single controlling criterion." *Id* (*quoting United States v. Agosto*, 502 F.2d 612, 614 (9th Cir.1974) (per curiam) (*citing Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047) (issue of voluntariness "remains a question of fact for determination upon the totality of the circumstances")).

#### 2.    Search Incident to Lawful Arrest

The "search incident to lawful arrest exception" derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations. *See United States v. Robinson*, 414 U.S. 218 (1973); *see also Chimel v. California*, 395 U.S. 752 (1969).  Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the compartment

searched at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest.  *See Arizona v. Gant*, 129 S.Ct. 1710 (2009).

### 3.    Inventory Search of Impounded Vehicle

When a car is impounded, police may conduct an inventory search if they follow guidelines for securing and inventorying the car's contents.  *See e.g. South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). The Supreme Court recognizes three distinct needs for inventory searches: (1) the protection of the owner's property, (2) to protect police against claims or disputes concerning missing property, and (3) the protection of police from potential danger.  *Id.* An inventory search may not be used as a ruse for general rummaging in order to discover incriminating evidence.  *Florida v. Wells*, 495 U.S. 1, 4 (1990).

### a.    Basis to Impound Car

In addressing whether the decision to impound a car violated the Fourth Amendment, the court in *United States v. Cervantes*, 678 F.3d 798, 805 (9th Cir. 2010) examined if the officers' conduct was consistent with and in furtherance of a "community caretaking function."  The court held that there was no evidence of a "caretaking function," as the car: (1) was not parked illegally, (2) posed no safety hazard, and (3) was not vulnerable to vandalism or theft.  *Cervantes*, 678 F.3d at 805.  This is not an exhaustive list, as the court in *Opperman* held that when there is a question as to the reasonableness of the impoundment and inventory search in relation to the Fourth Amendment, it must view the "facts and circumstances of this case in light of the principles set forth in...prior decisions."  *Opperman,* 428 U.S. at 375.

Under the "community caretaking function," the court does not examine whether the officer had probable cause to believe that there was a traffic violation, but must determine whether the impoundment fits within the "authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience ...."  *Opperman*, 428 U.S. 364, 369 (1976).  "[L]ocal police department policies that give officers discretion to choose whether to impound a vehicle are not

improper so long as police discretion is exercised "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity."" *Cervantes*, 678 F.3d at 806-807 (quoting *Bertine,* 479 U.S. at 375).

### b.   Basis to Inventory Car

Courts have "consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *Wells,* 496 U.S. at 373.  In order to ensure the inventory search is "limited in scope to the extent necessary to carry out the caretaking function," it must be carried out in accordance with the standard procedures of the local police department.  *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989) (citing *Opperman*, 428 U.S. at 375); *see also Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987). "[A]n  inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4.

The United States Supreme Court has held that when officers inventory a car after impounding it, this is done in response to three "distinct needs:" (1) the protection of the owner's property while it remains in police custody, (2) the protection of the police against claims or disputes arising from lost or stolen property, and (3) the protection of the police from potential danger.  *Opperman,* 428 U.S. at 369. Police intrusions are appropriate, the court stated, where the car is "in lawful police custody where the process is aimed at securing or protecting the car and its contents." *Id* at 373.  The court stated that "[i]t would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it." *Id* (citations omitted).

## II.   Defendant Poblete Has Standing to Assert a Fourth Amendment Violation

### A.   Burden of Proof

Defendant Poblete must demonstrate that he has standing to assert that the officers who searched the car he was driving violated his Fourth Amendment. *Rawlings*, 448 U.S. at 104.  Defendant Poblete

has the burden to establish that he had a legitimate expectation of privacy in the car he was driving, and the expectation was one that society would deem as objectionably reasonable. *Katz*, 389 U.S. 347.

### B.     Joint Control and Common Authority Establishes an Expectation of Privacy

It is undisputed that on the night of his arrest, Poblete was more than a "mere passenger" in the car, he was the driver.  (#20, #23, and #50).  It is also undisputed that he was not the true owner of the car, and that his girlfriend's father purchased the car for her to drive.  *Id.*  The court finds it appropriate to analyze Poblete's standing by looking at *Thomas,* 447 F.3d 1191 and *Portillo,* 633 F.2d 1313.  In those cases, the drivers of the car were not the true owner, but the court still found that they could have an expectation of privacy and standing to challenge the constitutionality of a search.  *Thomas,* 447 F.3d 1191; *Portillo,* 633 F.2d 1313.  In *Thomas,* the court held that "a defendant who lacks ownership interest," such as Poblete, "may still have standing to challenge a search, upon a showing of "joint control" or "common authority" over the property searched." *Thomas*, 447 F.3d 1196.

A finding of  "common authority," the court held, "rests on mutual use of the property by persons generally having joint access or control for most purposes."  *Id* (citing *Rodriguez,* 497 U.S. at 181).  Julie Alvarez' testimony and the evidence introduced during the hearing revealed that the car was purchased in California approximately three days prior to the incident by Julie's father, Cesar Alvarez.  (#50)(Government's Exhibits 2b, and Defendant's Exhibits E, F, J, K, and L).  Julie testified that her father purchased the car for her use and that Poblete, her boyfriend of almost 4 years, was there when the car was purchased.  (#50).  Julie also testified that it was either Poblete or her father who drove the car off the lot.  *Id.*  Poblete and Julie drove from California to Las Vegas prior to the incident, and Julie stated that she and Poblete took turns driving the car.  *Id.*  Julie also stated that they both had clothing in the car, as they were planning to stay in Las Vegas over night.  *Id.*  Julie testified that Poblete drove the car a couple of times since it was purchased.  *Id.*  This testimony demonstrates mutual use of the car by Poblete and Julie during the three day time period between the purchase of the car and the incident.  *See*

*Thomas*, 447 F.3d at 1196.  This testimony further demonstrates that Cesar Alvarez did not use the car during those three days in a manner consistent with that of an owner, rather it supports Julie's testimony that her father purchased the car for her use.  (#50).

To further establish "joint control" and "common authority" and conclude that the defendant had an expectation of privacy, the court in *Thomas* relied on several factors, including the fact that the defendant driver (1) was in possession of the car, (2) had permission of the owner, (3) held the keys to the car, and (4) had the right and ability to exclude others, except the owner, from the car.  *Id.*  The court in *Portillo* relied on similar factors in determining standing of the non-owner driver, in stating that the driver "had both permission to use his friend's automobile and the keys to the ignition and the trunk, with which he could exclude all others, save his friend, the owner."  *Portillo*, 633 F.2d at 1317.

The evidence presented to the court here demonstrates that Poblete satisfied these factors, and therefore, possesses an expectation of privacy that "society would accept[] as objectively reasonable." *Id* at 1196 (citing *Olson,* 495 U.S. at 95-96).  Poblete was undoubtedly in possession of the car and held the  keys to the car.  *Id;* (#50).  Both officers and Julie Alvarez testified that Poblete was the driver of the car, and, as such, he was in control of the car and had the keys.  *Id.*  Poblete satisfies the first and third factors.  *Thomas*, 447 F.3d 1196.  The government disputes, however, whether Poblete had permission from the owner to drive the car.  (#23).  As stated above, while the car was purchased by Cesar Alvarez, he did not conduct himself as the owner of the car, and instead, purchased the car for his daughter, Julie Alvarez' use.  (#50).  Testimony from Julie revealed that she permitted Poblete to drive the car, that her parents trusted Poblete, and that her father was "okay" with Poblete driving the car.  *Id.*  Poblete therefore received permission to drive the car.  *Id.*

In addition to the true owner being "okay" with Poblete driving the car, Poblete also received express permission from Julie Alvarez.  (#50).  In *Thomas,* 447 F.3d at 1196, the court addressed a similar situation, and held that "an unauthorized driver [of a rental car] who received permission to use a

rental car [from the authorized driver] and has joint authority over the car may challenge the search to the same extent as the authorized driver..."  Julie Alvarez was not the registered owner of the car.  (#50). Thomas' friend who was the "authorized driver" of the rental car was also not the registered owner. *Thomas,* 447 F.3d at 1195.  Both were "authorized" to drive the car.  (#50); *Thomas,* 447 F.3d at 1195. The difference here, which is a factor the court weighed heavily on in finding no expectation of privacy in *Thomas,* is that Thomas never presented any evidence or testimony demonstrating that he received permission from the authorized driver to drive the rental car.  *Id* at 1199.  Poblete, however, did receive permission from Julie Alvarez, the "authorized driver," and the court was presented with testimony establishing that fact.  (#50).  As the court concluded above, Poblete had "joint authority" over the car. With "joint authority" and permission from the authorized driver, Poblete satisfies the second factor. *Thomas,* 447 F.3d 1196.

        As the driver with keys to the car and permission, Poblete had the right and ability to exclude others, except Julie Alvarez and Cesar Alvarez.  (#50).  Prior to the incident at issue, Poblete and Julie Alvarez picked up Julie's aunt, Beverly Pacheco.  *Id.*  As Poblete was the driver of the car who possessed the keys and controlled the movement of the car, Poblete made the decision to permit  Ms. Pacheco to enter the car.  *Id.*  Poblete has satisfied the fourth factor.  *Thomas,* 447 F.3d 1196.  The court finds that Poblete had a reasonable expectation of privacy in the car he was driving, and therefore, standing to assert a Fourth Amendment violation.  *Id.*

**III.    The Search of the Car Did Not Violate Defendant Poblete's Fourth Amendment Rights.**

    **A.    Burden Of Proof**

        In an evidentiary hearing on a motion to suppress evidence due to a Fourth Amendment violation, the Government bears the burden of justifying a warrantless search.  *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991).  The government did not assert that the warrantless search was valid under either the consent or search incident to arrest exceptions.  (#23 and #49).  Here, the Government bore

the burden of establishing by a preponderance of the evidence that the decision to impound the car was lawful, that the inventory search was properly conducted, and that the LVMPD's policies were not violated.

### B.   The Decision to Impound The Car Was Proper

In the circumstances before this court, the officers' decision to impound the car was not a pretext for an investigative search, rather it was pursuant to LVMPD's policies and under the community care-taking function .

#### 1.   The Officers Followed The LVMPD's Policies

"[L]ocal police department policies that give officers discretion to choose whether to impound a vehicle are not improper so long as police discretion is exercised "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity."" *Cervantes*, 678 F.3d at 806-807 (quoting *Bertine,* 479 U.S. at 375).

##### a.   Section 5/202.20

Pursuant to Section 5/202.20 of the LVMPD Manual, "[t]he arresting officer has the option of asking the arrestee whether he wishes to park his vehicle or have it towed, if the following conditions exist: (1) Arrestee is 18 years or older, (2) Arrestee is not under the influence of intoxicating liquors or drugs, (3) Arrestee is in lawful possession of the vehicle, and (4) the vehicle is not needed for evidence. (#20-1 Exhibit A hereinafter "Department Manual").  Under the exceptions to this policy, it states that "[t]he arrestee may turn custody of the vehicle over to a licensed and responsible person who is a passenger at the time of arrest." *Id.*  Under Section 5/202.20, it also indicates that "[a]ll personnel are encouraged to utilize this procedure whenever possible." *Id.*

The record indicates that the officers discovered drugs on Poblete's person and placed hand cuffs on him prior to deciding to impound the car.  (#50).  As Poblete, an arrestee, was the driver of a car, Section 5/202.20 provides the officers with the option to either impound the car or, if certain conditions

are met, ask if Poblete wishes to park the car.  Department Manual Section 5/202.20.  Although Poblete arguably[6] satisfied the other conditions under Section 5/202.20, Officer Basner testified that he made the decision to impound the car and call for the tow truck because he could not identify the true owner of the car and whether Poblete was "in lawful possession of the vehicle."  (#50); Department Manual 5/202.20.

Officer Basner and Julie Alvarez both testified that Poblete did not provide the officers with his driver's license and paused as he spelled the false first name he initially provided.  *Id.*  Officer Basner's suspicions regarding the ownership of the car were raised when he discovered Poblete had lied about his identity and as the car did not have license plates and was not registered.  *Id.*  The paperwork provided to Officer Basner did not have any of the passengers' names on it, and the attempt to reach the owner, Ceasar Alvarez, to verify ownership was unsuccessful.  *Id.*  Officer Basner testified that the decision to call the tow was because he was not "sure if [the defendant and the passengers] were supposed to be in possession of the vehicle."  *Id.*  Department Manual Section 5/202.20 authorizes Officer Basner to give Poblete the option to park the vehicle if all conditions are satisfied, including being in lawful possession of the vehicle.

Absent any assurance that Poblete was in "lawful possession of the vehicle," Officer Basner had the discretion to impound the car Poblete was driving.  Department Manual Section 5/202.20; *See Colorado v. Bertine,* 479 U.S. 367, 375 (1987)(stating that "[n]othing in *Opperman* or *Lafayette* prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.").  The evidence taken as a whole, does not support a finding that Officers Basner and Johnson, "who were following standardized procedures, acted in bad faith or for the sole purpose of investigation."  *See*

---

[6] The government argued that Poblete could have been under the influence of drugs, as Officer Basner found a bag containing methamphetamine on his person.  (#23).  There was no evidence or testimony presented during the hearing to support the argument that the officers may have decided to impound the car based on defendant Poblete being under the influence of drugs.  (#50).

*Bertine,* 479 U.S. at 373(finding that officers made the decision to impound and search the car of a DUI arrestee in good faith).  The officers did not violate Section 5/202.20 of the LVMPD's policies.

While it is true that Officer Basner had the option under the exceptions to Section 5/202.20 to offer Poblete to "turn custody of the vehicle over to a licensed and responsible person who is a passenger at the time of arrest," the "the real question is not what 'could have been achieved,' but whether the Fourth Amendment requires such steps..."  Department Manual Section 5/202.20; *Bertine*, 479 U.S. 374 (quoting *Lafayette,* 462 U.S. at 647).  It is not the court's "function to write a manual on administering routine, neutral procedures of the station house," rather the court's "role is to assure against violations of the Constitution."  *See Lafayette,* 462 U.S. at 647.  The court recognizes that providing Poblete the opportunity to hand the keys to Julie Alvarez would have been a "less intrusive means" of accomplishing the officer's care taking function.  However, as the Supreme Court stated, reasonableness "does not necessarily or invariably turn on the existence of alternative, "less intrusive means," and the fact that the "protection of the public might, in the abstract, have been accomplished by 'less intrusive means' does not, by itself, render the search unreasonable."  *Id* at 648 (citations omitted).  As the court, "[w]e are hardly in a position to second-guess police departments as to what practical administrative method[s]" to devise to achieve the community care-taking function.  *Id.*

  **b.**  **Section 5/204.06**

Pursuant to Department Manual Section 5/204.06, "[w]henever a vehicle is towed under the listed circumstances, a Vehicle Impound Report (LVMPD 503) will be completed."  Subsection 6 states that a car may be impounded "[w]hen ownership and rightful possession by the driver is in doubt," and that when this is the case, "[t]he facts and circumstances leading to this decision will be explained in an Officer's Report."  Department Manual Section 5/204.06(6).  The testimony demonstrates that the car was not towed and that the tow truck did not arrive at the scene.  (#50).  A report explaining the facts leading up to the tow, therefore, would not be necessary, as the requisite condition, "[w]henever a

vehicle is towed," was not satisfied.  *Id*; Department Manual Section 5/204.06.  Section 5/204.06 also states that "[i]f at any point after the *vehicle has been placed* on the tow truck or *attached to the hook*, and before the tow truck has left the scene, the need for the tow has been eliminated, the vehicle will be released without towing.  The vehicle impound report will reflect that the vehicle was released and to whom."  Department Manual Section 5/204.06 (emphasis added).  As the tow truck never arrived and the car was not placed on the tow or attached to the hook, there is no requirement of the officers to document that the need to tow the car was eliminated.  *Id*.  The officers followed the LVMPD's policies when they decided to impound the car and to ultimately rescind the decision to impound, eliminating the need to fill out a Vehicle Impound Report.

     **2.**     **Community Care-Taking Function**

The court in *Opperman* recognized a "community care-taking function" under which officers may choose to impound the car driven by an arrestee.  *Opperman*, 428 U.S. at 369.  Under this function, the court does not examine whether the officer had probable cause to believe that there was a traffic violation, but must determine whether the impoundment fits within the "authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience ...."  *Opperman*, 428 U.S. at 369.  In determining the reasonableness of the impoundment and inventory search in relation to the Fourth Amendment, this court must view the "facts and circumstances of this case in light of the principles set forth in...prior decisions."  *Opperman,* 428 U.S. at 375.

The facts and circumstances in this case relating to the "community care-taking" function differ from those in Ninth Circuit precedent, but reasonableness is found nonetheless.  In *Cervantes,* the Ninth Circuit held that there was no evidence of a "caretaking function," as the car: (1) was not parked illegally, (2) posed no safety hazard, and (3) was not vulnerable to vandalism or theft.  *Cervantes*, 678 F.3d at 805.  In *United States v. Caseres,* the Ninth Circuit held that no community care-taking rationale was found, as (1) the car was parked legally, (2) the car was in a residential neighborhood and parked

two houses away from the defendant's home, (3) the possibility of vandalism was the same as if the officer had never arrested the defendant, (4) the car was not blocking a driveway or cross walk, and (5) the car was not a hazard to other cars on the road. *United States v. Caseres,* 533 F.3d 1064, 1075 (9th Cir. 2007). In these cases, there was no issue as to the true owner of the car the officers impounded. *Id*; *Cervates*, 678 F.3d 798.

Here, the evidence demonstrates that the car Poblete was driving was parked in a designated parking spot in the parking lot for a 24-hour bar. (#50 Defendant's Exhibits A and B). The car was parked legally, posed no safety hazard, was not blocking traffic, and was not subjected to any greater possibility of vandalism than it would have been if it were parked outside a home in the area. *Id.* Looking *only* at these factors, the court would find no community care-taking function. However, the Supreme Court instructs this court to examine the "facts and circumstances of this case in light of the principles set forth in...prior decisions." *Opperman,* 428 U.S. at 375. One of the principles set forth in the cases discussed in this section is that the officers have a duty to protect individuals' property, and that in fulfilling that duty, the officers may impound an arrestee's car under the care-taking function. *Caseres,* 533 F.3d at 1075; *Cervantes,* 678 F.3d at 805.

As discussed above, the officers could not confirm with the true owner of the car that Poblete was authorized to drive the car, and made the decision to impound it for safekeeping to protect the true owner from possible theft and/or any unauthorized person driving the car. (#50). Officer Basner was concerned about the protection of the owner's property when he made the decision to impound the car. *Id.* The protection of the owner's property falls under the community care-taking function. *Caseres,* 533 F.3d at 1075 (listing concerns about possible vandalism and theft when determining whether the officer's decision to impound the car was under the "care-taking function"); *Cervantes,* 678 F.3d at 805 (same). The facts in this case, therefore, support a finding that Officer Basner's decision to impound the

car for safekeeping was made under the "community care-taking function." *Id.*

### 3.      Decision to Impound Not Pretextual

In *Cervantes,* the Ninth Circuit found that the impoundment of a car and the subsequent search were a pretext for an investigative search, and therefore unlawful. *Cervantes*, 678 F.3d at 806. The court based its finding on the fact that (1) the officers stopped the car at the direction of another officer who had been surveillancing the car and radioed for another patrol car to develop a lawful reason to stop the car, (2) the impounding officers had been informed that other officers were investigating the driver for his possible involvement with a drug trafficking scheme, and (3) that the impounding officers were told to help with the investigation by finding a lawful reason to stop the car. *Id.* The court held that any evidence discovered as a result of the impoundment and search should have been suppressed. *Id.*

The facts before this court demonstrate that (1) the officers conducted the traffic stop because the car Poblete was driving had its high beams on, did not have a license plate, and was not registered, (2) Poblete raised the officers' suspicion when he did not have a driver's license and hesitated when spelling the false first name, and it was ultimately determined that he provided fake information to Officer Basner, (3) after Poblete consented to a search of his person, Officer Basner discovered the bag of methamphetamine and arrested Poblete, (4) that the decision to impound was made *after* Poblete was handcuffed and in custody and *after* the officers attempted to verify the true owner of the car, and (5) that, as discussed above, the impound and subsequent search were conducted pursuant to LVMPD's policies. (#50). The court finds that the decision to impound the car was not a pretext for an investigative search.[7]

. . .

. . .

---

[7] Conflicting evidence of asking permission to search the car does not require a finding of pretext. The court concludes that Officer Johnson did not ask for consent to search the car. However, a contrary finding on this fact issue would not change the undersigned's ultimate conclusion that the search was not based on pretext. An officer intending to impound a vehicle is free to ask permission to search, although permission is not required.

**C.      The Inventory Search of the Vehicle was Lawful**

**1.      Securing The Owner's Property and Protecting The Officers**

The search of the car Poblete was driving fell under the "distinct needs" enumerated by the Supreme Court for searching a car prior to impounding it.  *See Opperman*, 428 U.S. at 369.  After making the decision to impound the car Poblete was driving, the officers searched the car. (#50).  Since the true owner could not be contacted to come pick up the car, and the car would be in police custody, the officers needed to ensure that (1) the true owner's car and the contents therein were protected, (2) the contents of the car were inventoried as to protect the officers or any police personnel from later accusations of missing items from the car, and (3) the police officers and police personnel at the station are not subjected to any potential danger contained in the car.  *See Opperman*, 428 U.S. at 369 (stating that the three "distinct needs" include (1) the protection of the owner's property while it remains in police custody, (2) the protection of the police against claims or disputes arising from lost or stolen property, and (3) the protection of the police from potential danger).

The inventory search of the car that was to be impounded was properly tailored and conducted to protect both the owner and the officers.  *See Wells,* 496 U.S. at 373 (holding that courts have "consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents.").

**2.      LVMPD's Policies Were Not Violated**

Under Section 2/130.00 of the Department Manual, "[w]henever a vehicle is impounded, it will be thoroughly searched (including all containers located therein) and an inventory of all personal property will be made on the appropriate LVMPD form."   Section 5/204.06 also requires that "[i]mpounding officers must thoroughly search vehicles and containers located therein per 5/200.04. Personal property must be inventoried on the Vehicle Impound Report (LVMPD 503)."  Department Manual Section 5/204.06.  Under Section 5/200.04 relating to motor vehicle searches, "[w]hen a vehicle

is lawfully impounded (See 5/204.06), an officer shall conduct an inventory search of that vehicle and containers found therein and report all personal property on the LVMPD 503, Vehicle Impound Report." Department Manual Section 5/200.04.

Officer Basner was required, once the decision to impound the car was made, to search the car and take an inventory of the car's contents. *See* Department Manual Sections 2/130.00, 5/204.06 and 5/200.04.  Testimony presented at the hearing demonstrates that the search was conducted pursuant to these policies.  (#50).  The inventory search, which was conducted in compliance with the LVMPD's policies, was aimed at carrying out the care-taking function and therefore lawful.  *See Wanless*, 882 F.2d at 1463 (holding that in order to ensure the inventory search is "limited in scope to the extent necessary to carry out the caretaking function," it must be carried out in accordance with the standard procedures of the local police department)(citing *Opperman*, 428 U.S. at 375); *see also Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987).

The second portion of Sections 2/130.00, 5/204.06, and 5/200.04 require the impounding officers to fill out an inventory form of all contents of the impounded car.  Department Manual Sections 2/130.00, 5/204.06, and 5/200.04.  The testimony revealed that no inventory form was filled out in this case.  (#50).  The court notes that the applicable provisions of the Department Manual requiring that an inventory form be filled out state that **"whenever a vehicle is impounded" or "[w]hen a vehicle is lawfully impounded," the "impounding officers"** must inventory the contents of the car on the LVMPD form.  Department Manual Section 2/130.00, 5/204.06, and 5/200.04.  The testimony presented demonstrates that the impoundment never occurred and that Julie Alvarez drove the car away on the night in question.  (#50).  Thus, as the car was not impounded, the requirement to fill out the inventory form was not triggered.  Department Manual Section 2/130.00, 5/204.06, and 5/200.04.  The officers did violate the applicable sections of the LVMPD's policies regarding the inventory search of the car.

The fact that the tow truck was called off *after* Detective Thai was able to confirm with Cesar Alvarez that he was the true owner and his daughter Julie Alvarez could take the car, does not change the finding that the initial decision to impound the car and conduct an inventory search of the car was lawful and in accordance with LVMPD's policies.

**IV.     Exclusionary Rule**

If the court determines that a seizure is unreasonable and in violation of the Fourth Amendment, any evidence obtained as a result of the seizure may not constitute proof against the victim of the violation.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  "[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."  *Terry*, 392 U.S. at 29 (citing *Warden*, 387 U.S. at 310).   As the government has sustained its burden, proving by a preponderance of the evidence that the warrantless search was justified under the Fourth Amendment, the evidence discovered by means of the search should not be suppressed.  *Id.*

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Defendant Poblete's Motion To Suppress (#20) should be DENIED.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 31st day of October, 2012.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE